JUDGE NEY, concurring in part and dissenting in part.
¶ 66 I concur with Part II of Judge Fox's opinion holding that defendant preserved his argument that he received an inadequate Miranda warning and that defendant received an inadequate Miranda warning because he was not informed of his right to the presence of an attorney during an interrogation. I also concur with Part III of Judge Fox's opinion holding that admission of the video recording was harmless beyond a reasonable doubt as to defendant's conviction for unlawful distribution of an illegal substance.
¶ 67 But, I conclude that the admission of the video recording was not harmless beyond a reasonable doubt as to defendant's convictions for conspiracy to commit first degree murder and intimidating a witness because the prosecution used the video recording to argue that defendant was capable of forming the requisite mental state to commit those crimes. I would also not address the issue of the jury's unfettered access to the video recorded interrogation because that issue was predicated on the admissibility of his video recorded interrogation, which I conclude should have been excluded as not harmless beyond a reasonable doubt. Therefore, I respectfully dissent in part.
¶ 68 Miranda originally adopted a per se prohibition against the admission of any statements made in the absence of the "procedural safeguards" now known as the Miranda warning and held that the use of such statements by the prosecution in its casein-chief would result in the setting aside of the resulting conviction. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, one year after Miranda was announced, the United States Supreme Court decided Chapman v. California, in which it held that even evidence obtained in violation of constitutional protections may be admitted if the reviewing court can "declare a belief that" the evidence "was harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
¶ 69 I review the admission of a statement obtained in violation of Miranda under this harmless-beyond-a-reasonable-doubt standard. People v. Trujillo, 49 P.3d 316, 326 (Colo.2002) ; see also Velarde v. People, 171 Colo. 261, 270, 466 P.2d 919, 924 (1970) ("We are of the opinion that where an admission by the defendant is used as evidence in violation of Miranda, it is proper to determine whether, under the circumstances of the case, the error was harmless beyond a reasonable doubt."), overruled in part on other grounds by Jorgenson v. People, 174 Colo. 144, 148, 482 P.2d 962, 964 (1971) ; People v. Frye, 2014 COA 141, ¶ 6, 356 P.3d 1000.
¶ 70 To determine whether an error is harmless beyond a reasonable doubt, I must ask " 'if there is a reasonable possibility that the [error] might have contributed to the conviction.' " Hagos v. People, 2012 CO 63, ¶ 11, 288 P.3d 116 (quoting Chapman, 386 U.S. at 24, 87 S.Ct. 824 ).
¶ 71 In making this determination, I examine several factors including "the importance of the witness' testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence on the material points of the witness' testimony," and "the overall strength of the prosecution's case." Blecha v. People, 962 P.2d 931, 942 (Colo.1998) (citing Merritt v. People, 842 P.2d 162, 169 (Colo.1992) ).
*26 ¶ 72 Here, the video recording was important to the prosecution's case because one of the contested elements was whether defendant had the mental capacity to intend to murder Marshall-Fields and his fiancée or to cause Marshall-Fields not to testify against Ray. See § 18-2-201(1), C.R.S.2014 (defining conspiracy and requiring intent to promote or facilitate commission of crime); § 18-3-102, C.R.S.2014 (defining first degree murder and requiring intent to cause death of another person); § 18-8-704, C.R.S.2014 (defining intimidating a witness and requiring intent to influence witness not to testify).
¶ 73 In support of defendant's theory that he did not have the mental capacity to form the culpable mental state for the crimes charged against him, he introduced an expert psychologist who testified that defendant has an IQ of sixty-four, is mildly mentally disabled, and has a severe generalized cognitive disorder. Based on several tests, the psychologist noted that defendant had a number of deficits, including low social skills, that placed him overall in the bottom one to three percent of the population.
¶ 74 The prosecution used defendant's inconsistent and incomplete answers during his interrogation to establish that he was capable of forming the requisite mental state for the crimes charged by making the following statements in closing arguments:
• Defendant denied knowing Ray in his interrogation because "Ray is the motive [for the crimes]. So he's denying knowledge of Robert Ray or denying any involvement with Robert Ray to say, I had no motive to commit this crime."
• Defendant's "denial of his involvement in giving lawful explanations for his behavior at [the sports bar] shows that he understood and appreciated what he was doing and the wrongfulness of it."
• "It is not really overwhelming evidence that [defendant's] retardation is a part of this crime.... When you evaluate how much [defendant] was able to make decisions on his own and to evaluate what he should or shouldn't do, look at him talking to [the detective]. She's using these investigative techniques, these interview techniques, and yet he doesn't give it up. She's able to get these wily veterans of the criminal justice system to give it up. In spite of the fact that they're at risk in getting a snitch jacket in the penal system, she's able to get those people to talk to her. She wasn't able to get it out of [defendant].... He gave her an innocent explanation for everything he had or every bit of evidence that they had against him, and an innocent explanation or a lack of involvement explanation for the rest. You know, distancing himself from Robert Ray, because he understood that Robert Ray was the connection between him and the victim."
• "In terms of the defendant's condition of being mildly mentally retarded, [the expert psychologist] never indicated that there was anything about the defendant's condition that prevented him from deliberating or prevented him from forming an intent.... [The expert] talked a little bit about how the defendant's mind works, and yet, you see repeatedly examples of the defendant being able to function; that there's no dispute that he is mildly mentally retarded. But you've got to see him for about an hour and a half, talking with [the detective]. How are his verbal skills? Does he understand the questions he's being asked? Does he answer them appropriately? You know, was he able to use his own words for things?"
¶ 75 The prosecution also discussed the content of the video recording in opening statements, before introducing it as an exhibit in its case-in-chief during the testimony of the detective who interviewed defendant.
¶ 76 During deliberation, the jury had unlimited access to the video recording of defendant's interrogation and received a transcript of the interrogation after requesting one. The court instructed the jury to rely on the video recording of the interrogation and not on the transcript of the interrogation. But, the court gave the jury no instruction *27 regarding the use of the video recording itself.
¶ 77 The People contend that the video recording was not important to their prosecution because defendant made no significant admissions during the interrogation. However, the warnings are "prerequisites to the admissibility of any statement made by a defendant" whether the prosecution characterizes the statement as inculpatory or exculpatory. Miranda, 384 U.S. at 476-77, 86 S.Ct. 1602. While I agree that defendant did not make any significant admissions during the interrogation, the prosecution used the video recording to challenge defendant's defense, and, for that reason, it was important to the prosecution's case against defendant for conspiracy to commit first degree murder and intimidating a witness.
¶ 78 However, I do agree that the video recording was irrelevant to the prosecution's case against defendant for unlawful distribution of a controlled substance because defense counsel did not contend at trial that defendant's cognitive abilities would have prohibited him from knowingly distributing an illegal substance. See § 18-18405(1)(a), C.R.S. 2014 (requiring someone to "knowingly" manufacture, dispense, sell, or distribute a controlled substance to be guilty of unlawful distribution of a controlled substance).
¶ 79 Defendant's testimony in the video recording was cumulative regarding his presence at the sports bar with Marshall-Fields and his connection with Ray. There was also corroborating evidence on the material points of defendant's testimony during the interrogation. But, defendant did not testify at trial and the video recording was the jury's only opportunity to observe defendant responding to questions.
¶ 80 The video recording was neither cumulative nor corroborative of defendant's charges for unlawful distribution of an illegal substance because neither the police officer nor the detective mentioned anything about defendant's possible involvement with distributing drugs.
¶ 81 Based on my review of the evidence, I conclude that the admission of defendant's videotaped statements was not harmless beyond a reasonable doubt as to defendant's convictions for conspiracy to commit first degree murder and intimidating a witness. The video recording likely prejudiced defendant by allowing the prosecution to argue, and the jury to observe, that defendant could have formed the requisite mental state to commit these crimes.
¶ 82 But, I also conclude that the video recording was harmless beyond a reasonable doubt as to defendant's conviction for unlawful distribution of a controlled substance because this crime was not the subject of the interrogation. Defense counsel never contended that defendant could not "knowingly" commit an act. And defendant's drug distribution was never discussed during the interrogation. Thus, the prosecution's references to the video recording to show that defendant could act intentionally were irrelevant to this charge. See § 18-18-405(1)(a).